IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 5:21-cr-23 |
| v. | ) | |
| | ) | |
| RICHARD E. MOORE | ) | |

### THE UNITED STATES' POSITION ON SENTENCING

For more than a decade, Richard Moore cavalierly ignored his legal obligation to pay employment taxes and instead diverted the money that he withheld from his employees' paychecks to fund his lavish lifestyle. Even after he was indicted for this conduct, Moore displayed a remarkable contempt for the law by *continuing* to commit the very same crimes. His attitude can be summed up in his response to an employee who reminded Moore—after he had already been indicted—that he needed to pay the IRS:

> On Mon, Nov 14, 2022 at 11:32 AM Richard Moore <rmoore@nexushelps.com> wrote:
> We will be tomorrow grandma

Exhibit 465.[1] Consistent with Moore's blatant disregard for the law, he did not pay the IRS as promised, either on the following day or any day thereafter. His actions caused a loss to the IRS of almost $3.2 million, which Moore could easily have funded from the more than $11.6 million of Nexus Services' money that he elected to spend on himself and his spouse/co-owner, Michael Donovan:

---

[1] This numbering reflects the trial exhibit numbering. Since Moore pled guilty on what was to be the first day of his trial, the United States prepared its full set of trial exhibits and will use that numbering convention throughout this sentencing paper.



Exhibit 611.[2]

When Moore was confronted about his failure to pay the IRS, he offered a litany of excuses as to why he could not comply with his straightforward duty. As but one example, in just a few-week period, Moore made the following claims in emails to his payroll provider:

- December 28, 2018: "I will send over [the trust fund taxes] when I get back into the US tonight. I am working with the Caravan in Mexico currently doing aid work." Exhibit 414.

- January 8, 2019: "It is midnight in London. I had a calm today [*sic*]. When I wake up I will send a detailed email. I apologize but I am in regulatory meetings with the EU and UK this week that are very stressful." Exhibit 153.

---

[2] This chart reflects the total *trust fund taxes* that Moore willfully failed to pay the IRS. Trust fund taxes include all taxes withheld from employees' paychecks: federal income, Social Security, and Medicare taxes. *See* Dkt. No. 221 at ¶ 11. Employers are also responsible for paying the IRS a matching portion of Social Security and Medicare taxes—the so-called *employer's portion*—which constitutes relevant conduct. *See* Dkt. No. 221 at ¶¶ 12, 35. When these amounts are added, which constitutes relevant conduct. *See* Dkt. No. 221 at ¶¶ 12, 35. When these amounts are added, which Moore's tax loss totals $3,197,801. Even at this higher amount, the chart illustrates how Moore spent more than three times as much of Nexus Services' money on himself and Donovan as he owed the IRS.

- January 9, 2019: "I have had very intense meetings in Europe. Tomorrow I have a presentation at the British House of Lords and am free to work on this afterwards." *Id.*

- January 11, 2019: "I am trying desperately to get back home. My flight tomorrow morning is now cancelled. I am literally stuck in Amsterdam. I will be stateside in a good time zone in a decent place Monday somewhere to work on this." Exhibit 155.

To Moore, his crimes were always someone else's fault. For instance, in a pretrial filing, Moore claimed that his former employee, Rebecca Neal, "had done a disastrous job of calculating taxes," and that this is why Nexus Services had not paid trust fund taxes.[3] Dkt. No. 185 at 5. A photograph of Moore on his wedding day—a wedding Moore financed with $573,270 in Nexus Services' funds—succinctly captures Moore's refusal to accept blame:



---

[3] Much of the United States' investigation was focused on proving that Moore knew that Nexus Services was not paying its trust fund taxes and that the failure to pay could not credibly be blamed on someone else.

Exhibit 520. A total sentence of 120 months—60 months each on Counts 8 and 9 to be run *consecutively*—is needed to drive home the gravity of Moore's conduct and to preclude him from once again flouting the law for his own gain.

## I.   PROCEDURAL BACKGROUND

Moore was indicted on December 9, 2021, and charged with 10 counts of willful failure to account for and pay over trust fund taxes for Nexus Services ("Nexus"), in violation of 26 U.S.C. § 7202. Dkt. No. 1. Two years later—on November 9, 2023—a grand jury returned a superseding indictment, which charged Moore with two additional counts of aiding in the preparation of his own false tax returns by causing Nexus to issue false Forms W-2, in violation of 26 U.S.C. § 7206(2). Dkt. No. 50. Those Forms W-2 indicated that Moore had withheld and paid income taxes from his own and his spouse, Michael Donovan's, paychecks. In fact, as Moore knew, he had not paid most of the income taxes he had withheld.

After Moore's trial was continued from December 2023 to December 2024, the United States learned that Moore was continuing not to account for and pay over Nexus's trust fund taxes. This conduct began after Moore's initial indictment and continued through the first quarter of 2024—during the time that Moore was scheduled to be tried for his earlier failure to pay trust fund taxes. On September 26, 2024, a grand jury returned a second superseding indictment charging Moore with six additional counts of willful failure to account for and pay over Nexus's trust fund taxes. Dkt. No. 97.

On January 7, 2025—after the jury had reported for trial—Moore entered a guilty plea to Counts 8 and 9 of the Second Superseding Indictment, which charged him with willful failure to account for and pay over Nexus's trust fund taxes. Dkt. No. 206.

4

## II.    FACTUAL BACKGROUND

Moore was executive vice president and part-owner of Nexus from when the company

formed in 2014 through at least 2022. PSR (Dkt. No. 221) at ¶ 35. Even after Moore purported to

give up his ownership interest in Nexus and his position as a company executive, he continued to

exercise control over Nexus's financial affairs through at least April 2024. *Id.* Between 2014 and

2024, Moore regularly failed to pay any of Nexus's trust fund taxes or paid only a fraction of what

the company owed, as shown below:



Exhibit 600. The times Moore did pay in full, he often paid late—sometimes years late. *See*, *e.g.*,

Exhibit 24 at 11 (showing multiple payments in 2020 for taxes owed for the fourth quarter of

2018); Exhibit 27 at 10 (showing multiple payments in 2018 for taxes owed for the fourth quarter

of 2015).

Moore did not even cease his tax crimes after he was indicted in December 2021. From the fourth quarter of 2022 through the first quarter of 2024, he did not pay *any* of the trust fund taxes he withheld from his employees' paychecks. PSR at ¶ 48. To conceal his continued tax fraud, Moore used bank accounts in the name of a nominee, and purportedly relinquished his ownership and position at Nexus. *Id.* Moore also sought to make his tax fraud difficult for the IRS to detect by not filing Forms 941 reporting what Nexus had withheld and owed the IRS. *Id.*

### a. *Moore's Initial Failure to Pay Nexus's Trust Fund Taxes in 2014 and 2015*

Moore signed Nexus's first ever Form 941 for the first quarter of 2014, thereby demonstrating his responsibility for the company's withheld trust fund taxes. *Id.* at ¶ 36. According to the date below Moore's signature, he signed the return on April 3, 2014, shortly after the first quarter ended:



Exhibit 1 at 3. However, Moore did not file the return with the IRS until a year later—April 7, 2015. *Id.* at 2.

Moore then used a Nexus M&T Bank account ending in -2355 to pay the taxes listed on the return. Exhibit 251. Only Moore and Donovan had signature authority on that account, *see* Exhibit 246 at 5, which received regular monthly deposits throughout 2015 of between approximately $648,000 and $1.8 million. *See* Exhibit 247 at 1, 23, 43, 70, 92, 109, 128, 147, 164, 177, 187, and 197. By contrast, the M&T Bank account ending in -6545, which Rebecca Neal, the former Nexus employee in charge of payroll at the time, was directed to use to cut checks to

employees for their net pay in late 2015, received only sufficient deposits from the M&T Bank account ending in -2355 to cover net payroll but not enough to pay the withheld trust fund taxes. *See* Exhibit 268 at 14-25. Thus, Moore's attempts to blame Neal for Nexus's failure to pay its trust fund taxes are disingenuous, since he actually controlled the company's finances.

Between the second quarter of 2014 and the third quarter of 2015,[4] Moore did not pay any of the trust fund taxes withheld from employees' paychecks to the IRS. Nor did he file Forms 941 with the IRS to account for the trust fund taxes withheld. PSR at ¶ 36. Before the criminal investigation, therefore, the IRS was unaware of Moore's failure to pay trust fund taxes for these quarters and the amount he owed. Ultimately, using Nexus's internal records and records that Nexus supplied to its payroll provider, Gusto, the government was able to determine that Moore failed to pay at least $483,014 in withheld trust fund taxes for the first three quarters of 2015. *Id.*

During the same period that Moore failed to pay the IRS the trust fund taxes withheld from employees' paychecks in 2014 and 2015, he nevertheless managed to pay *all* the Virginia income tax that Nexus withheld. *Id.* On Nexus's internal documentation, Virginia income taxes were calculated on the *very same* records that were used to calculate withheld trust fund taxes. Nexus's monthly payroll register for August 2015 illustrates this:

(Virginia income taxes withheld – right next to trust fund taxes)



| Employee ID | DEPARTMENT | Title | Name, Last | Name, First | STATE | Annual Salary | Monthly Gross | Weekly Gross | Production Pay | Total Monthly Gross | Insur Deduct | Monthly Taxable | FED Tax | STATE Tax | FICA TAX | Weekly Net Pay | Other Deduct | Net PAY Monthly (II) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10011 | SERVICES | President/CEO | Donovan | Michael | VA | $240,000 | 23,076.90 | 4,615.38 | | 23,076.90 | 66.4½5= 332.05 | 22,744.85 | 6,729.56 | 1,286.50 | 1,740.00 | 2,801.76 | | 14,008.80 |
| 10020 | SERVICES | VP Operations | Moore | Richard | VA | $224,000 | 21,538.45 | 4,307.69 | | 21,538.45 | 57.55½5= 287.75 | 21,250.70 | 6,208.50 | 1,180.55 | 1,625.70 | 2,841.59 | | 13,207.95 |
| 10001 | SERVICES | VP Operations | Ajin | Evan | VA | $85,000 | 8,173.10 | 1,634.62 | | 8,173.10 | 60.90x5= 304.90 | 7,868.10 | 1,218.85 | 411.05 | 601.95 | 1,127.26 | | 5,630.30 |
| 10041 | SERVICES | Executive Assistant | Fleming | Jonathan | VA | $44,000 | 4,230.75 | 846.15 | | 4,230.75 | | 4,230.75 | 501.80 | 201.90 | 323.65 | 640.58 | | 3,203.40 |
| | SERVICES | Office Admin | Fife | Robin | VA | $30,000 | 576.92 | 576.92 | | 576.92 | 18.62x1= 18.62 | 558.30 | 68.24 | 23.83 | 42.71 | 423.52 | | 423.52 |
| | SERVICES | IT Manager | Stipe | Timothy | VA | $40,000 | 769.23 | 769.23 | | 769.23 | 5.57x1= 5.57 | 763.66 | 87.51 | 35.64 | 58.42 | 582.09 | | 582.09 |
| 10023 | SERVICES | Chief Financial Off | Neal | Rebecca | VA | $60,000 | 5,769.25 | 1,153.85 | | 5,769.25 | 53.27x5= 266.35 | 5,502.90 | 828.25 | 276.05 | 421.00 | 795.72 | | 3,978.60 |
| 10022 | SERVICES | Chief Gov Affairs Off | Nagel | Richard | VA | $40,000 | 3,846.15 | 769.23 | | 3,846.15 | 5.25x5= 26.25 | 3,819.90 | 392.95 | 178.30 | 292.35 | 593.28 | | 2,966.40 |
| 10032 | SERVICES | Chief Risk Officer | Schneider | Erik | VA | $60,000 | 5,769.25 | 1,153.85 | | 5,769.25 | 32.31x5= 161.55 | 5,607.70 | 664.55 | | 429.00 | 902.63 | | 4,514.15 |

---

[4] The United States did not charge Moore's willful failure to pay Nexus's trust fund taxes for 2014 because this conduct was out of statute. Although not included in Moore's total tax loss, the IRS estimates that his failure to pay these taxes would amount to approximately $100,000 of additional tax loss.

Exhibit 125.

A printout from the Virginia Department of Taxation's website shows that Moore himself

reported and paid Nexus's August 2015 Virginia state income tax withholding:

**Tax Return Detail**

This return was filed on-line by Richard Moore on Sep 25, 2015

Employer's Return of Virginia Income Tax Withheld:

| | |
|---|---|
| Va. Income Tax Withheld | $10,169.17 |
| Previous Period(s) Adjustment | $0.00 |
| Adjusted Total | $10,169.17 |
| Penalty | $0.00 |
| Interest | $0.00 |
| Total Amount Due | $10,169.17 |

Exhibit 126; *see also* Exhibit 549 (showing that, in 2014 and 2015, Richard Moore was the only

individual at Nexus with the ability to log on to the Virginia Department of Taxation and pay).

Moore had the information he needed to also pay the IRS; he simply chose not to.

### b. *Moore's Cancellation of Nexus's Payroll Processing in 2016 and 2017*

After Nexus transitioned to Gusto as its payroll provider in late 2015, Moore began

regularly cancelling payroll processing in Gusto and instructing Chad Sager, the Nexus employee

handling payroll at that time, to issue employees paychecks for their net pay. PSR at ¶ 37.

However, on the occasions when payroll was not processed in Gusto, Gusto did not remit trust

fund taxes to the IRS, which Moore knew and intended not to pay. *See id.* Nexus's Form 941 for

the second quarter of 2016 provides a striking illustration of the result:



Exhibit 4. Although Nexus paid employees weekly, Nexus made only a *single* payment to the IRS during the entire second quarter. Had Moore paid the IRS as required by law, this schedule would have included *multiple* payments per month—each for about the same amount as the one shown above.

During the first and second quarters of 2017, Moore admitted to personally cancelling at least 11 separate payroll periods in Gusto and never subsequently processing them. PSR at ¶ 37. Below is an example of one such payroll:

Exhibit 77 (showing, in red box, Moore cancelling payroll—changing its status to "unprocessed"—within two hours of payroll being initially processed, as shown in yellow box). The United States was ultimately able to determine that Moore failed to pay $120,418 in trust fund taxes for those 11 payroll periods. PSR at ¶ 37. This determination required the IRS case agent to laboriously compare each pay period processed in Gusto against Nexus's bank account records.

### c. *Moore's Failure to Pay Trust Fund Taxes in 2019 and 2020*

In 2017 and 2018, Nexus typically remitted trust fund taxes to the IRS through ADP, its payroll provider at the time. However, by the second half of 2018, Moore stopped paying Nexus's payroll, which included its withheld trust fund taxes, in a timely fashion. *Id.* at ¶ 38. In August 2018, Stephanie Cash, who handled Nexus's payroll at the time, sent Moore a text message

pleading with him to pay Nexus's payroll and reminding him that ADP's services would be terminated if Nexus did not pay:



Exhibit 378. After Moore continued not paying, ADP followed through on its threat to terminate Nexus's payroll services about three weeks later. *See* PSR at ¶ 38.

In late 2018, Moore signed a contract with another payroll company, Paychex, to provide payroll services, which included Paychex's agreement to remit withheld trust fund taxes to the IRS beginning from the date ADP terminated Nexus's account. *Id.* This was Nexus's third payroll provider in less than 18 months. On December 13, 2018, the Paychex representative handling Nexus's account emailed Moore to remind him that Nexus owed employment taxes for prior payroll periods and to ask about Moore's plan to pay those amounts:

| Message | |
| --- | --- |
| From: | Pfefferle, Heather [hpfefferle@paychex.com] |
| on behalf of | Pfefferle, Heather <hpfefferle@paychex.com> [hpfefferle@paychex.com] |
| Sent: | 12/13/2018 7:43:15 PM |
| To: | Richard Moore [rmoore@nexushelps.com] |
| CC: | Lisa Breeden [lbreeden@nexushelps.com]; Bishop, Sarah Elizabeth [sbishop@paychex.com] |
| Subject: | Outstanding tax liability ***URGENT*** |
| Importance: | High |

Hi Richard,

As you know, there are 12 past payrolls from earlier in 2018 that Paychex still needs to process before December 31st. With only 12 business days left in the year after today, it is imperative that we come up with a plan for processing these right away. We can continue to receive wired funds for these if that is what you prefer, but we need your approval to begin processing these. At this point, we essentially need to process one every day, your current payrolls notwithstanding.

Please let me know if you have some time to discuss this. Below are the total liability amounts for the outstanding payrolls.

| Taxes Paychex is Paying | |
| --- | --- |
| Date | Total |
| 9/4 | 48222.47 |
| 9/11 | 46138.52 |
| 9/11 | |
| 9/18 | 47289.03 |
| 9/25 | 44543.57 |
| 10/2 | 44192.12 |
| 10/9 | 44727.31 |
| 10/16 | 44983.56 |
| 10/23 | 44121.62 |
| 10/30 | 43726.24 |
| 11/6 | 43516.10 |
| 11/13 | 43982.73 |
| 11/20 | 41549.44 |
| Total | 536992.71 |

Exhibit 149.

When Moore *still* had not paid by mid-January 2019, Paychex held a telephone conference with Moore and Lisa Breeden, the Nexus employee then handling payroll, and informed them that Nexus would now be responsible for paying its own trust fund taxes to the IRS, effective immediately. *See* Exhibit 156 at 2. That same day, Paychex returned $86,429 in wires to Nexus, *see* Exhibit 157, and instructed Moore that "[t]he funds we returned to you can be used to make those [outstanding] tax payments." Exhibit 159. However, IRS records show that Moore

nevertheless paid *nothing* to the IRS for the entire first quarter of 2019. *See* Exhibits 23 at 2-3; Exhibit 24 at 8-9.

For subsequent quarters, Moore continued not paying the IRS a substantial portion of the trust fund taxes Nexus withheld from employees' paychecks, even though he received a report from Paychex every week that showed him exactly how much Nexus owed in withheld taxes:

| 0942 1605-2759  Nexus Services Inc | **CASH REQUIREMENTS** | |
|---|---|---|
| **CASH REQUIRED FOR NEGOTIABLE CHECKS & /OR ELECTRONIC FUNDS TRANSFERS (EFT) FOR CHECK DATE 06/04/19: $0.00** | | |

**TRANSACTION SUMMARY**

| **SUMMARY BY TRANSACTION TYPE -** | CASH REQUIRED FOR NEGOTIABLE CHECKS &/OR EFT | 0.00 |
|---|---|---|
| | TOTAL CASH PAYROLL | 93,530.33 |
| | TOTAL MANUAL CHECKS/UPDATES | 3,414.77 |
| | CASH REQUIRED BEFORE REMAINING D / W / L | 96,945.10 |
| | TOTAL REMAINING DEDUCTIONS / WITHHOLDINGS / LIABILITIES | 50,592.28 |
| | CASH REQUIRED FOR CHECK DATE 06/04/19 | 147,537.38 |

**TRANSACTION DETAIL**

**CASH PAYROLL** - *These amounts were paid in cash to your employees by you.*

| **TRANS. DATE** | **BANK NAME** | **ACCOUNT NUMBER** | **PRODUCT** | **DESCRIPTION** | | **TOTAL** |
|---|---|---|---|---|---|---|
| 06/04/19 | Cash Payroll | | Payroll | Cash | 93,530.33 | |
| | | | | **TOTAL CASH PAYROLL** | | **93,530.33** |

**MANUAL CHECKS/UPDATES** - *These amounts are for previously calculated checks that were issued by you. You may have already deducted these funds from your account.*

| **TRANS. DATE** | **BANK NAME** | **ACCOUNT NUMBER** | **PRODUCT** | **DESCRIPTION** | | **TOTAL** |
|---|---|---|---|---|---|---|
| 06/04/19 | Refer to your records for account information | | Payroll | Check Amounts | 3,414.77 | |
| | | | | **TOTAL MANUAL CHECKS/UPDATES** | | **3,414.77** |

**REMAINING DEDUCTIONS / WITHHOLDINGS / LIABILITIES** - *Paychex does not remit these funds. You must ensure accurate and timely payment of applicable items.*

| **TRANS. DATE** | **BANK NAME** | **ACCOUNT NUMBER** | **PRODUCT** | **DESCRIPTION** | | **TOTAL** |
|---|---|---|---|---|---|---|
| 06/04/19 | Refer to your records for account information | | Payroll | Employee Withholdings | | |
| | | | | Social Security | 6,983.33 | |
| | | | | Medicare | 2,025.21 | |
| | | | | Fed Income Tax | 17,267.11 | |
| | | | | AZ Income Tax | 68.59 | |
| | | | | CA Income Tax | 399.54 | |
| | | | | CA Disability | 87.16 | |
| | | | | GA Income Tax | 132.11 | |
| | | | | NC Income Tax | 45.00 | |
| | | | | PR Income Tax | 345.71 | |
| | | | | PR Disability | 1.58 | |
| | | | | VA Income Tax | 4,761.33 | |
| | | | | **Total Withholdings** | **32,116.67** | |

Exhibit 395 at 13.

Despite consistently not paying Nexus's trust fund taxes, Moore nevertheless applied for and received a $1,399,856 Payroll Protection Program (PPP) loan backed by the federal government. PSR at ¶ 39. In support of Nexus's PPP loan application, Moore submitted an unfiled Form 941 for the fourth quarter of 2019, which falsely indicated that Nexus had paid $453,596.11 in employment taxes for the quarter. *Id.* In fact, Moore paid nothing during the quarter and less than $11,000 in total. *See* Exhibit 23 at 12-13.

### d.  Moore's Renewed Failure to Pay Trust Fund Taxes After Indictment

After the United States first interviewed Lisa Breeden in December 2020, Moore began paying the IRS the trust fund taxes he withheld from Nexus employees. PSR at ¶ 40. However, Moore's newfound compliance with the law did not survive for long. Within a year of his December 2021 indictment, Moore once again stopped paying the IRS the trust fund taxes withheld from employees' paychecks. On August 30, 2022, Breeden emailed Moore and others regarding Nexus's unpaid taxes:

| From: | Lisa Breeden <lbreeden@nexushelps.com> |
| To: | Richard Moore <rmoore@nexushelps.com>;David See <dsee@nexushelps.com>;Mike Donovan <mdonovan@nexushelps.com> |
| Sent: | 8/30/2022 2:15:09 PM |
| Subject: | Re: 8/19/2022 Taxes to be wired |

Good Morning everyone,

I am not sure where we are on this but I thought That I would bring this back up to the top of everyone's list. In order to reinstate direct deposit like Mike would like to do this week we must pay week before last week's taxes as well as last week's taxes.
Please let me know where we are on this

Exhibit 458.

One of the individuals copied on the email, David See, was a former Nexus employee who now operated his own business, Subversivo. See opened a bank account in Subversivo's name, which he allowed Moore to use. PSR at ¶ 41. Despite the appearance that the account was See's, text messages make clear that Moore was directing See what to do with funds in the account. For instance, on September 29, 2022, Moore texted See:



Exhibit 445. One minute later, See texted Breeden:



Exhibit 444. Consistent with these text messages, Moore admitted in his Statement of Facts that

the purpose of this account was, at least in part, to disguise his continued control over Nexus's

financial accounts and to conceal the fact that he remained responsible for paying Nexus's trust

fund taxes. Dkt. No. 208 at ¶ 24.

Shortly after the September 29, 2022 payment, Moore ceased paying the IRS altogether. PSR at ¶ 41. Throughout, Breeden continued to remind Moore that he needed to pay the trust fund taxes that Nexus had withheld from employees' paychecks. For example, on November 10, 2022, Breeden emailed Moore:

On Thu, Nov 10, 2022 at 4:24 PM Lisa Breeden <lbreeden@nexushelps.com> wrote:
Good Evening team,

I was finally able to get a past payroll into the ADP system The numbers are as follows:

US Tax: $10,905.89
PR Tax:$379.38

Let me know when the taxes will be sent so that I am able to process the payroll

Exhibit 465. After two more reminders from Breeden, Moore finally responded as quoted in the first paragraph above: "We will be tomorrow grandma." *Id.* Despite his promise, Moore never again paid the IRS. PSR at ¶ 41.

### e.   *Moore Used the Money Withheld from Employee's Paychecks to Live Lavishly*

At least in part, Moore chose not to pay the IRS so he could spend the money he withheld from his employees' paychecks to fund his own, lavish lifestyle. PSR at ¶¶ 43-47. Moore's profligacy with Nexus's money included more than $500,000 spent toward the purchase of multiple luxury vehicles, including three Maseratis, three Ferraris, and two BMWs. *Id.* at ¶ 47. Moore also spent more than $1.1 million of Nexus's money to pay for a book, *Not Free America: What Your Government Doesn't Want You to Know*, which was a vanity project of Donovan's. The expenses for the book included $300,000 for a ghostwriter; approximately $150,000 for self-publishing; and approximately $650,000 for publicity. *Id.* at ¶ 46.

Moore's lavish spending also extended to events that the company staged. For instance, Moore spent more than $1.2 million of Nexus's money on various company-attended retreats and

16

shows. *Id.* at ¶ 44. Spending for these events included approximately $322,0000 for Fall Out Boy to perform at Adamfest, a celebration of Donovan's brother's birthday, and $80,000 to fly a musician by private jet so that he could perform at an All-Staff event in Orlando. *See* Exhibits 195 and 197. Even more egregiously, Moore spent more than $573,000 in Nexus funds for his August 2016 wedding.[5] PSR at ¶ 45.

Finally, Moore and his husband, Donovan, received exorbitant salaries from Nexus at the same time that Moore chose not to pay the trust fund taxes he withheld from employees' paychecks. This included a combined salary of $988,112 in 2019, when Nexus failed to pay $871,201 in trust fund taxes. *See* Exhibit 610. Despite Moore's failure to pay most of Nexus's trust fund taxes for 2019, he nonetheless claimed the full amount of income tax withholding reported on his own and Donovan's Forms W-2 on his 2019 income tax return. Dkt. No. 208 at ¶ 21. Based on this claim, the IRS issued Moore a refund of $1,429 for taxes he never actually paid. *See* Exhibits 32 and 366. Moore did the same thing in 2020 and received a $4,663 refund from the IRS for taxes he never paid. *See* Exhibits 33 and 367.

## III.    THE APPROPRIATE GUIDELINES RANGE

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Sentencing Guidelines are now advisory. 543 U.S. 220, 264 (2005). "In the wake of *Booker* … the discretion of sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (quoting

---

[5] Notably, Moore deducted the $150,000 that he spent for musician Nate Ruess to perform (billed to Paradigm Talent Agency) as a "marketing" expense on Nexus's 2016 corporate income tax return. This had the dual effect of (1) falsely lowering Nexus's 2016 tax bill and (2) avoiding what should have been reported as personal income on Moore's 2016 income tax return.

*Booker,* 543 U.S. at 264). Both "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Therefore, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005). This ensures that "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green,* 436 F.3d 449, 455 (4th Cir. 2006).

### a. *The Guidelines Calculation*

Probation has correctly calculated Moore's Guidelines, PSR at ¶¶ 60-71, 155, as follows:

**Base Offense** (U.S.S.G. §§2T1.6, 2T4.1)

| | |
|---|---|
| Tax loss of more than $1,500,000 but less than $3,500,000 | 22 |
| Abuse of position of trust (U.S.S.G. § 3B1.3) | +2 |
| Obstruction of justice (U.S.S.G. §3C1.1) | +2 |
| Obstruction of justice for offense while on release (U.S.S.G. §3C1.3) | +3 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| **Total Offense Level** | **27** |

An offense level of 27, with a criminal history category V, corresponds to a prison sentence of 120 to 150 months. However, because Moore's statutory maximum sentence (120 months) is less than his maximum Guidelines range, his exposure is capped at 120 months.

The parties agree as to tax loss and the enhancements for abuse of position of trust (U.S.S.G. §3B1.3) and obstruction of justice for an offense committed while on pretrial release (U.S.S.G. §3C1.3). The defendant objects to his criminal history calculation and the obstruction of justice enhancement for willfully obstructing or attempting to instruct the administration of justice with respect to the investigation, prosecution, and sentencing of his crimes (U.S.S.G. §3C1.3). Dkt. No. 222.

### b.  *Moore's Criminal History was Correctly Calculated*

Probation correctly assigned Moore a total of 10 criminal history points, which puts him in criminal history category V. PSR at ¶ 73-103. Moore objects that he should not receive any criminal history points for his prior sentences (1) on July 14, 2009 in Rockingham County (Va.) General District Court for obtaining less than $200 by false pretenses; (2) on December 9, 2009 in Louisa County (Va.) Circuit Court for issuing two or more bad checks within 90 days; and (3) on December 9, 2009 in Hanover County (Va.) Circuit Court for issuing a bad check worth $200 or more because he contends that none of these offenses are currently considered felonies under Virginia law. Dkt. No. 222.

However, the Guidelines do not require that the sentence imposed be for a felony in order to assign criminal history points to it. U.S.S.G. §4A1.2(c); *see also United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019) ("[T]he Guidelines require the district court to count certain prior misdemeanor offenses[.]"). Moore's July 14, 2009 sentence in Rockingham County General District Court was for a misdemeanor offense. Nevertheless, Moore was assigned one criminal history point for this sentence because the offense, obtaining property by false pretenses, in violation of Va. Code § 18.2-178, is not listed among the misdemeanor offenses that are excluded. U.S.S.G. §4A1.2(c).

The other two sentences—from December 9, 2009 in Louisa County Circuit Court and Hanover County Circuit Court—were felonies when Moore committed them. The fact that Virginia may now treat them as misdemeanors is immaterial. *See United States v. Champion*, 777 F. App'x 66, 70 (4th Cir. 2019) (unpublished) ("[T]here is no support in the Guidelines for [the defendant's] assertion that Georgia's subsequent reclassification of the statutory rape offense from a felony to a misdemeanor precludes assessment of criminal history points[.]"). But even

assuming that the crimes for which Moore was sentenced were misdemeanors, they would still receive criminal history points. Moore was sentenced to two years of supervised probation in Louisa County Circuit Court and two months of prison in Hanover County Circuit Court. PSR at ¶¶ 93-94. Therefore, both sentences—even if for misdemeanor bad check offenses—would receive criminal history points. *See* U.S.S.G. §4A1.2(c)(1) (counting sentences for insufficient funds check offenses where the defendant received a term of probation of more than one year or a term of imprisonment of more than 30 days).

### c.  The Enhancement for Obstruction of Justice Was Correctly Applied

Moore also objects to the application of a two-level enhancement, pursuant to U.S.S.G. §3C1.1 for obstructing or attempting to obstruct the administration of justice with respect to the investigation, prosecution, or sentencing of his offenses. Dkt. No. 222. His rationale for the objection is that the finding in the PSR is "factually inaccurate and acontextual," although he provides no support for this contention.

In fact, there are two separate bases for applying the enhancement. The Guidelines indicate that a defendant should receive a two-level increase if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and [] the obstructive conduct related to [] the defendant's offense of conviction and any relevant conduct[.]" U.S.S.G. §3C1.1.

First, Moore's conduct in 2022 through early 2024 was intended to frustrate the United States' ongoing investigation into his failure to pay trust fund taxes withheld from Nexus employees' paychecks. The Guideline application notes specify that "the conduct to which this adjustment applies is not subject to precise definition" and "can vary widely in nature, degree of planning, and seriousness." *Id.* at comment. n.3. Among the specific, *non-exhaustive* examples

included in the application notes is the defendant's production or attempted production of "a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." *Id.* at comment. n.3. The Fourth Circuit, in upholding an obstruction enhancement on this basis, recognized the overlap between an enhancement for sophisticated means and the obstruction enhancement but noted that the obstruction enhancement "punishes conduct carried out with the purpose of frustrating an actual investigation." *United States v. Thorson*, 633 F.3d 312, 321 (4th Cir. 2011).

As summarized in the Factual Background section above, after Moore learned in December 2020 that the United States had interviewed Lisa Breeden, who was handling Nexus's payroll, he began paying the IRS the trust fund taxes withheld from Nexus employees' paychecks. The chart below shows this period of compliance:



Exhibit 600. As seen by the check marks that populate 2021 and the first three quarters of 2022,

Moore's compliance lasted for less than two years. By the fourth quarter of 2022—as shown above—Moore had once again stopped paying the trust fund taxes withheld from Nexus employees' paychecks.

Since Moore knew that the United States was continuing to investigate him, he took several steps to conceal his crime and to obstruct the United States' ongoing investigation and prosecution of his failure to pay trust fund taxes. First, Moore claimed to transfer his ownership interest in Nexus to his husband, Donovan. According to Nexus's court filings in civil litigation with RLI Insurance Company, Moore supposedly relinquished his ownership interest to Donovan in February 2022. *See* Case No. 5:18-cv-066-MFU-JCH (W.D. Va.), Dkt. No. 862-1 at 1-2. In an effort to investigate this claimed transfer, the United States issued a grand jury subpoena to Nexus on September 4, 2024 requesting any documentation relating to the purported transfer. PSR at ¶ 52. Nexus failed to produce any records to substantiate the transfer in response to the subpoena. Despite failing to produce any records to the United States, Moore represented shortly thereafter in a court pleading, which he filed to contest his bail revocation, that he had "not been a part of Nexus for years[.]" Dkt. No. 113 at 4.

In a further effort to obscure his control over Nexus's business and finances, Moore purportedly began working as a contracting "consultant" for Nexus in approximately September 2023. PSR at ¶ 42. Despite this purported change, Moore retained his position as executive vice president and continued to provide direction regarding Nexus's financial affairs, as illustrated by the email he sent on January 24, 2025, instructing Lisa Breeden to stop paying him a salary through Progage, a corporate entity owned by Moore and funded by Nexus:

22

On Wed, Jan 24, 2024 at 1:51 PM Richard Moore <rmoore@nexushelps.com> wrote:
Hi!  Take me off of Progage please.

Richard

**Richard Moore**
Executive Vice President

E rmoore@nexushelps.com

Nexus Services Inc.
113 Mill Place Pkwy Suite 103
Verona VA 24482

www.nexushelps.com

Exhibit 470.

On April 12, 2024, Moore was also recorded on a jail call with Lisa Breeden directing her to increase his Nexus paycheck by $50 to help cover the cost of phone calls that he was making from jail. Exhibit 450. Again, the United States sought records via a grand jury subpoena to Nexus to substantiate Moore's claim to be a "consultant." Once again, Nexus failed to produce any records to the subpoena.

Moore ultimately admitted in the Statement of Facts accompanying his guilty plea that, although he "purported to transfer his ownership interest to Micheal Donovan … Moore continued to exercise control over Nexus's business and financial affairs, including determining which of Nexus's bills to pay and when to pay them." Dkt. No. 208 at ¶ 23. This admission directly contradicted Moore's earlier assertion in a court pleading that he had "not been a part of Nexus for years[.]" Dkt. No. 113 at 4.

In his Statement of Facts, Moore also acknowledged that he "chose to open bank accounts in the name of Subversivo to disguise his continued control over [Nexus's] accounts and to conceal the fact that he remained a responsible person for paying Nexus's trust fund taxes." Dkt. No. 208

at ¶ 24. By opening nominee bank accounts in the name of Subversivo, Moore willfully caused the creation of false documents that purported to show Subversivo and its owner, David See, controlled Nexus's funds and paid Nexus employees when, in fact, Moore did. Thus, although Moore did not directly produce false documents to the government, he understood and intended that the government would receive false documents from the banks. These included account applications, signature cards, and checks purportedly signed by David See. *See*, *e.g.*, Exhibits 439-41.

Second, the obstruction enhancement applies because Moore provided materially false information to U.S. Magistrate Judge Joel C. Hoppe and to this Court in an effort to remain free on bond. The Guidelines application notes indicate that "providing materially false information to a judge or magistrate judge" is grounds for the enhancement. U.S.S.G. § 3C1.1 at comment. n.3. The application notes define "material" as something that "if believed, would tend to influence or affect the issue under determination." *Id.* at comment. n.6. The Fourth Circuit has previously upheld the application of the enhancement under analogous circumstances, such as where a defendant failed to disclose $22,500 of his net worth when applying for court-appointed counsel, *see United States v. Westmoreland*, 72 F. App'x 29, 31 (4th Cir. 2003) (unpublished), and where a defendant submitted a false affidavit that was intended to be used in support of a co-conspirator's bail application. *See United States v. Clark*, 580 F. App'x 153 (4th Cir. 2014) (unpublished).

Moore, through counsel, represented at his detention hearing before U.S. Magistrate Judge Hoppe on October 15, 2024:

> But 45 days from the trial you think – with an affidavit and a change of ownership he's going to go and sneak behind the Court's back and file false taxes for those two businesses [Entlest Brands, Inc. and Gamer Oasis, LLC] when there's no evidence that he's done it right now up to this date? He's been the owner of those businesses for years. He's been the owner, not a bunch of Nexus employees. Richard has been the owner of those two businesses, Honorable Judge Hoppe, for

years and there's never been a tax problem. And if there were, they'd know about it.

Dkt. No. 131-1 at 22. Thereafter, Moore's counsel directly reiterated the above argument in his motion to this Court to overturn Magistrate Judge Hoppe's bail determination. Dkt. No. 131 at 5.

Based in part on Moore's assertions that he was and would remain in compliance with his employment tax obligations, this Court ordered Moore's release on November 8, 2024 subject to the additional release condition that Moore, with the assistance of counsel, "put into place a system whereby a certified public accountant agrees to be responsible for tendering [] trust tax deposits and making any required returns to the IRS with regard to those trust taxes[.]" Dkt. No. 139.

Moore failed to abide by this condition, as clearly demonstrated by the emails with the CPA he retained and confirmed by the CPA, Sherea Hallberg, in a subsequent interview.

On December 9, 2024, CPA Hallberg emailed Moore's defense counsel:

Last week Entlest/ which is now Gamer Oasis started off their first payroll OUT OF compliance. They ran the payroll themselves based off some calculations from the inactive Gusto system. I am not sure how they could run a correct calculation when they did not provide the completed employee packets to her with the updated W4 and VA4 withholding numbers and no ID information on the I9.

As far as I know they are not supposed to be working people nor paying people who have NOT completed an I9 form. This is out of compliance. They seem to be running their business as usual without providing the documentation needed for compliance oversight.

As of now, they ran their first payroll for the new company, and I have no information whatsoever on anything they used to run it. As of today, I cannot say that I have anything to review compliance for Entlest either. They are NOT in compliance as of this email for either company.

At this point in time, I will have to say they have NOT complied with the court orders.

Exhibit A at 3-4.[6] CPA Hallberg also warned Moore's defense counsel on December 11, 2024 that the Forms W-2 that Entlest Brands, Inc. ("Entlest") was going to issue for 2024 would not match the Form 941, which suggested that there were errors in the reporting process. *Id.* at 1.

CPA Hallberg's warnings that Entlest was out of compliance are born out by the Form 941 that the company filed for the fourth quarter of 2024 and by the Forms W-2 that the company filed in early 2025. According to Entlest's fourth quarter 2024 Form 941, the company paid no wages and withheld no trust fund taxes. Exhibit B. However, the emails and CPA Hallberg's subsequent statements make clear that Entlest continued to operate and pay employees during the fourth quarter of 2024. *See* Exhibit A. Thus, the Form 941 for this quarter is not accurate, and Entlest has not paid its trust fund taxes. Entlest also filed Forms W-2 for its employees for 2024 that inaccurately listed their wages and withholding as less than they actually were. Jordan Bushong is one example. Through June 2, 2024, Mr. Bushong earned net income from Entlest of $16,534.75. Exhibit C. However, the Form W-2 filed with the IRS for Mr. Bushong indicates that he earned gross wages of only $6,559 in 2024. Exhibit D. Therefore, clearly not all of Mr. Bushong's wages and withholding were reported to the IRS on his Form W-2, as CPA Hallberg had warned on December 11, 2024.

The United States intends to call CPA Sherea Hallberg as a witness at Moore's sentencing hearing to testify about his noncompliance with the conditions of his release.

## IV.    CONSIDERATION OF § 3553(A) FACTORS & RECOMMENDED SENTENCE

After calculating the appropriate guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence

---

[6] The exhibits cited in this section were not included among the United States' trial exhibits. They have been added as new exhibits and assigned letters so as to distinguish them from the United States' trial exhibits.

[within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (cleaned up). Those factors include the nature of the offenses, the characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, afford deterrence, protect the public, and provide the defendant with needed educational or other training. 18 U.S.C. § 3553(a). The Court need not weigh the factors equally but must consider each of them. *United States v. Fowler,* 948 F.3d 663, 674 (4th Cir. 2020).

A 120-month prison sentence is sufficient, but not greater than necessary, to adequately account for the seriousness of Moore's offenses, to promote respect for the law, and to deter him from committing still more crimes.

### a. A 120-Month Sentence Reflects the Nature and Circumstances of Moore's Offense and Provides Just Punishment

Moore did not merely fail to pay taxes; he misappropriated money withheld from his employees' paychecks, which they had earned for their work and which was entrusted to him as a fiduciary, to enrich himself rather than pay the IRS. He did not use the money he took to keep a struggling business afloat or to keep paying his employees their salaries. Instead, he diverted the money so that he could afford the following sorts of purchases, among others:

- More than $500,000 on luxury cars, including three different Maseratis, three different Ferraris, and a two different BMWs, among them the 2015 BMWi8 and 2010 Ferrari California photographed in Moore's driveway below (PSR at ¶ 47; Exhibit 189);



- More than $573,000 on Moore's wedding to Michael Donovan, his Nexus co-owner, which included fashion design and wedding wear from Apuje Kalu, flowers from Southern Blooms, table settings from MS Events, sound and stage from Southard Audio, and musician Nate Ruess's performance, as noted below (PSR at ¶ 45; Exhibits 215-16, 220);







A visual depiction of the amounts Nexus owed in trust fund taxes (red) compared to what Moore spent frivolously (grays, blues, and greens) captures just how easily Moore could have paid the IRS, if he had wanted to:



29

Exhibit 610. The truth, however, was that Moore was happy to steal the money entrusted to him from his employees' withholdings. That is why he offered absurd excuses to his payroll provider when reminded to pay. *See* Exhibits 53, 155, and 414. And that is why he dismissed Lisa Breeden's entreaties to pay the IRS with a derisive: "We will be tomorrow grandma." Exhibit 465.

A 120-month prison sentence will also reflect the serious harm that Moore's crimes have caused. Too often, tax crimes are seen as victimless. But just because the harm caused by such crimes is diffuse does not make it any less real. The loss that Moore caused to the public fisc amounts to almost $3.2 million. This represents a significant harm. As a means of reference this amount could fund such things as yearly Medicaid benefits for approximately 351 recipients;[7] yearly Supplemental Nutrition Assistance Program (SNAP) benefits to 1,257 families;[8] or countless other programs and services critical to Americans.

This is especially true for trust fund taxes, which directly fund Social Security and Medicare. Under the latest set of projections, Social Security is predicted to deplete the reserves that fund the program by 2033 and Medicare hospital insurance by 2028.[9] When employers, like

---

[7]    *See*    https://www.medicaid.gov/state-overviews/scorecard/measure/Medicaid-Per-Capita-Expenditures?measure=EX.5&measureView=state&stratification=463&dataView=pointInTime&chart=map (last visited May 21, 2025) (listing $9,108 for total median per capita expenditures for Medicaid in 2022, the most recent available data).

[8] *See* https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research#:~:text=In%20FY%202023%2C%20SNAP%20served,%24211.93%20per%20participant%20per%20month (last visited May 21, 2025) (listing average SNAP benefit as $211.93 per participant per month in 2023, the most recent available data).

[9] 2024 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds, May 6, 2024, *available at* https://www.ssa.gov/OACT/TR/2024/tr2024.pdf; 2024 Annual Report of the Board of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, May 6, 2024, *available at* https://www.cms.gov/oact/tr/2024.

Moore, steal from the Social Security and Medicare taxes paid by their employees, it undermines the financial stability of a system from which all Americans benefit.

### b. A 120-Month Sentence Will Promote Respect for the Law and Afford Adequate Deterrence to Others Considering Tax Crimes

A 120-month sentence is necessary to deter other business executives, who may be similarly tempted to enrich themselves using the money withheld from their employees' paychecks. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation and citation omitted); *see also United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2012) ("[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed.").

This is especially true for tax offenses, which are inherently difficult to detect and prosecute. Data from the United States Sentencing Commission bears this out; during the decade from fiscal years 2015 through 2024, there were only 525 tax cases prosecuted in the entire Fourth Circuit. And during that span of time, only 45 tax cases were prosecuted in this district—an average of less than five per year.[10] For this reason, the United States Sentencing Commission in its commentary has explicitly stressed:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying the Sentencing Guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G., Ch. 2, Pt. T, intro. comment.

---

[10] *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed May 20, 2025).

This principle is something that the Fourth Circuit has incisively explained and endorsed in overturning a tax offender's sentence of probation:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010). The nation's tax system relies on the voluntary compliance of individual taxpayers to file accurate tax returns and pay their taxes. The integrity of that system is threatened when taxpayers lose confidence that those who cheat will be caught and punished.

A 120-month sentence for Moore, therefore, sends the appropriate message that tax crimes—especially egregious ones like Moore's—are serious offenses and will result in a meaningful term of incarceration. Conversely, a sentence without meaningful incarceration will undermine deterrent efforts and send the wrong message: that tax cheats do not go to jail for their crimes.

### c.  A Sentence of 120 Months Will Avoid Unwarranted Sentencing Disparities

Moore's lengthy criminal history separates his case from many others that involved a similar tax loss. Nevertheless, two recent sentencings from this District provide a helpful point of comparison and support the need for a lengthy prison sentence to avoid unwarranted sentencing disparities:

- *United States v. Herman Lee Estes, Jr.*, Case No. 7:23-cr-042-EKD-CKM (W.D. Va.). On May 15, 2025, the Court sentenced Mr. Estes to 84 months of imprisonment. Dkt. No. 264. Mr. Estes' offense level was 28 and his criminal history category IV for a Guidelines range 110 to 137 months, *see* Dkt. No. 259 at 6—less than Moore's range of 120 to 150 months. Like Moore, Mr. Estes pled guilty but, unlike Moore, did so more than two weeks before his scheduled trial date and before the jury was present at the courthouse. *See* Dkt. Nos. 176, 178. In sentencing Mr. Estes to 84 months, the Court ultimately varied downward by 26 months. Although Mr. Estes claimed millions of dollars in tax refunds, which were

included in his intended tax loss figure, he only succeeded in obtaining $2.6 million—less than the loss Moore caused the IRS. *See* Dkt. No. 259 at 7. Moreover, unlike Mr. Estes, Moore does not suffer from serious mental health issues that might mitigate his crimes. *See* Dkt. Nos. 126, 254.

- *United States v. James C. Jones, Jr.*, Case No. 7:20-cr-046-MFU (W.D. Va.). On May 7, 2024, the Court sentenced Mr. Jones to 78 months of imprisonment. Dkt. No. 171. Mr. Jones' offense level was 26 and his criminal history category I for a Guidelines range of 63 to 78 months, which is substantially less than Moore's. *Id.* Moreover, Mr. Jones caused a tax loss to the United States that was approximately half of Moore's. *See* Dkt. No. 169 at 7. After trial, the Court sentenced Mr. Jones to the high end of his Guidelines range, even though he had no criminal history, unlike Moore.

A sentence of 120 months of imprisonment—the bottom end of Moore's Guidelines range— would be commensurate with the above sentences and would avoid unwarranted sentencing disparities.

### d. Moore's History and Characteristics Support a 120-Month Sentence

Moore's extensive criminal history embodies his refusal to abide by the law. Although Moore is in criminal history category V, even this understates the full breadth of his crimes and the likelihood that he will reoffend, since none of the following offenses were counted toward his criminal history:

- March 3, 1996 (Age 18) – Convicted of issuing a bad check, PSR at ¶ 75;

- January 30, 1998 (Age 20) – Convicted of issuing a bad check, *Id.* at ¶ 80;

- May 5, 1998 (Age 20) – Convicted of issuing multiple bad checks valued at $1,354 payable to Lowes, *Id.* at ¶ 81;

- December 11, 1999 (Age 22) – Convicted of *three* separate offenses for issuing bad checks, which included issuing a check drawn on a non-existent business that Moore claimed belonged to his father, *Id.* at ¶¶ 83-85;

- April 19, 2000 (Age 22) – Convicted of uttering a forged check for trying to purchase a $19,388 Lincoln Continental with two counterfeit checks for $5,000 each and then driving the car to Florida (and damaging it) before leaving it at Midway Airport in Chicago, *Id.* at ¶ 86;

- August 2, 2000 (Age 23) – Convicted of issuing bad checks, *Id.* at ¶ 87;

- August 31, 2000 (Age 23) – Convicted of petit larceny by false pretense, *Id.* at ¶ 88;

- June 6, 2004 (Age 26) – Convicted of issuing bad checks, *Id.* at ¶ 89;

- December 9, 2009 (Age 32) – Convicted of issuing bad checks with a value of less than $200, *Id.* at ¶ 92; and

- December 5, 2023 (Age 46) – Convicted of contempt, *Id.* at ¶ 98.

Moore's past crimes also exhibit a contempt for judicial authority and a willingness to lie to avoid responsibility for his conduct. In September 2023, Moore was found guilty of perjury for initiating a false criminal complaint, but the court withheld judgment on the condition that Moore complete community service. *Id.* at ¶ 96. When Moore did not comply with the court's order of community service, the court found him in contempt and sentenced him to prison. *Id.* at ¶¶ 96, 98. Similarly, Moore was convicted of submitting a forged document to a sentencing court in another case claiming that he had completed a diversion program when, in fact, he had not. *Id.* at ¶ 97. This Court should therefore take care when weighing any self-serving claims Moore may make at his sentencing.

### e. A 120-Month Sentence Is Necessary to Specifically Deter Moore as well as to Protect the Public from Further Crimes He May Commit

In addition to his criminal history, Moore has demonstrated throughout the lifespan of this case that he will not stop committing crimes unless forced to do so. Moore repeatedly committed the same crimes over more than a decade—pay period after pay period, employment tax quarter after employment tax quarter. He did so across three different payroll providers—one of which Nexus used on two separate occasions—and despite the efforts of four different Nexus employees to pay the company's trust fund taxes, all of which Moore stymied. Even *after* a grand jury indicted Moore for willfully failing to pay Nexus's trust fund taxes in December 2021, he *again* stopped paying them just a short time later in September 2022. Not only did Moore stop paying Nexus's

trust fund taxes in 2022, but he also attempted to conceal his continued crimes from federal investigators by purportedly giving up his ownership in Nexus and by paying Nexus's payroll out of Subversivo's bank accounts to hide his control over the funds. Once the United States uncovered Moore's continued tax crimes, he promised this Court that he would comply with his legal obligations if released on bond. Yet he did not. Moore cannot be trusted to follow the law. A lengthy prison sentence is necessary to impress upon him the seriousness of his conduct and to keep the public safe from further crimes he might commit.

V.    **CONCLUSION**

The United States respectfully requests this Court sentence Moore to 120 months in prison and three years of supervised release and order him to pay restitution in the amount of $3,023,984.29, as the parties agreed in the Plea Agreement. The United States submits that this sentence is sufficient, but not greater than necessary, to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney

By:    */s/ William M. Montague*
William M. Montague
Matthew C. Hicks
Trial Attorneys
U.S. Department of Justice, Tax Division
150 M Street, N.E.
4 Constitution Square, Mail Stop: 1.1505
Washington, D.C. 20002

Ph:    (202) 616-2386
Fax:    (202) 514-0961
Email: william.m.montague@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 5:21-cr-23 |
| v. | ) | |
| | ) | |
| RICHARD E. MOORE | ) | |

**EXHIBIT LIST IN SUPPORT OF SENTENCING**

| Exhibit # | Description |
|---|---|
| 1 | Nexus Services Form 941 for Employment Tax Quarter Ending March 31, 2014 |
| 4 | Nexus Services Form 941 for Employment Tax Quarter Ending June 30, 2016 |
| 23 | Nexus Services Form 941 Transcripts for 2019 Employment Tax Quarters |
| 24 | Nexus Services Form 941 Transcripts for 2018 Employment Tax Quarters |
| 27 | Nexus Services Form 941 Transcripts for 2015 Employment Tax Quarters |
| 32 | Richard Moore & Micheal Donovan 2019 Form 1040 |
| 33 | Richard Moore & Micheal Donovan 2020 Form 1040 |
| 77 | 2017-03-02 Payroll Details Showing Moore Cancelled |
| 125 | August 2015 Nexus Payroll Register for Virginia |
| 126 | August 2015 VA5 Withholding Tax Return iFile Summary |
| 149 | December 13, 2018 Email from Paychex to Richard Moore re: Outstanding Tax Liability |
| 153 | January 9, 2019 Email Response from Richard Moore to Paychex re: Outstanding Liabilities |
| 155 | January 11, 2019 Email Response from Richard Moore to Paychex re: Update on Outstanding Tax Liability |
| 156 | January 17, 2019 Email from Paychex to Lisa Breeden (cc Richard Moore) Attaching Recap of 1/17/2019 Meeting |
| 157 | January 17, 2019 Email from Paychex to Richard Moore Summarizing Funds Returned to Nexus |
| 159 | January 18, 2019 Email from Paychex to Lisa Breeden (cc Richard Moore) re: using funds we returned to make tax payments |
| 189 | Photo of 2015 BMW i8 (VIN WBY2Z2C56FV674620) in Front of Moore and Donovan's House |
| 195 | Rider to Contract with Prince Royce Dated October 7, 2016 for Additional $80,000 Travel Reimbursement (Unsigned) |
| 197 | Email Chain October 19, 2016 re: $80k Prince Royce Check Showing Richard Moore Handling Payment of Check for Private Jet |

| 215 | Photo of Inside of Reception Tent with Flowers by Southern Blooms and Placesettings by MS Events |
| 216 | Photo of Moore and Wedding Party in Apuje Kalu Wedding Wear |
| 220 | Photo of Nate Ruess Performing with Full Stage and Audience |
| 246 | M&T Bank Nexus Payroll Account x2355 Signature Card |
| 247 | M&T Bank Nexus Payroll Account x2355 Statements from January 1, 2015 through December 31, 2015 |
| 251 | April 9, 2015 Payment to the IRS for $11,126.82 from M&T Bank Nexus Payroll Account x2355 |
| 268 | M&T Bank Nexus Payroll Account x6545 Statements from January 1, 2015 through December 31, 2015 |
| 378 | Text messages from Stephanie Cash to Richard Moore and Tim Okonski re: Funds Needed to Cover Payroll in ADP |
| 395 | Paychex Cash Requirements Reports for May 28, 2019 to June 25, 2019 |
| 414 | December 28, 2018 Email from Richard Moore to Paychex re: Sending Payroll Tax Wire Tonight Because in Mexico with Caravan |
| 439 | North American Banking Company Subversivo account applications and opening docs |
| 440 | North American Banking Company Subversivo signature card and account resolution |
| 441 | Citizens Bank Subversivo Signature Card |
| 444 | Sept. 27 and 29, 2022 Texts between David See and Lisa Breeden re: Payroll Tax Wires |
| 445 | Sept. 27 and 29, 2022 Texts between David See and Richard Moore re: Payroll Tax Wires |
| 450 | Jail Call Lisa Breeden 4-12-2024 1211.mp3 |
| 458 | 2022.08.30 Email from Lisa Breeden to Richard Moore, Mike Donovan, and David See re: Paying Tax Wires to ADP to Get Back on Direct Deposit |
| 465 | 2022.11.17 Email Chain Between Lisa Breeden and Richard Moore (cc: Mike Donovan) re: Unpaid Payroll Taxes for Pay Period Oct. 7, 2022 |
| 470 | 2024.01.24 Email chain with Breeden, Donovan, Moore, Ajin, and Shipe re: payroll numbers |
| 520 | Photo of Richard Moore Before Wedding with Sign |
| 549 | Virginia Department of Taxation iFile User Information |
| 600 | Timeline Showing Returns, Payments, Employees, and Payroll Providers |
| 610 | Bar Chart Summary of Select Spending out of Nexus's Accounts vs. Tax Liability |
| 611 | Select Spending vs. Tax Liabilities Progression Summary |
|  |  |
| A | Emails from CPA Hallberg re: compliance |
| B | Entlest Brands, Inc. 4th Quarter 2024 Form 941 |
| C | Paychecks to Jordan Bushong from Entlest Brands |
| D | 2024 Form W-2 Summary Entlest Brands |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

UNITED STATES OF AMERICA,      )
                                   )    Criminal No. 5:21-cr-23
        v.                 )
                                   )
RICHARD E. MOORE           )

### ANTICIPATED WITNESS LIST FOR SENTENCING HEARING

1.  Sherea Hallberg, Shen Valley Tax & Bookkeeping, Inc.

## CERTIFICATE OF SERVICE

I do hereby certify that I have this date electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.

This 22nd day of May, 2025.

/s/ William M. Montague
Trial Attorney
U.S. Department of Justice, Tax Division